UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DARCELLE L. DeROSIA,

                    Plaintiff,

        v.

CAROLYN W. COLVIN,[1]
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____

<u>DECISION & ORDER</u>

16-CV-6093P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Darcelle L. DeRosia ("DeRosia") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 11).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 8, 14).  For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards.  Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and DeRosia's motion for judgment on the pleadings is denied.

---

[1] On January 23, 2017, after this appeal was filed, Nancy A. Berryhill became Acting Commissioner of Social Security.

## BACKGROUND

### I.       Procedural Background

DeRosia protectively filed for DIB alleging disability on January 7, 2011, as a result of a right knee injury, memory loss, and a learning disability.  (Tr. 282, 286).[2]  On April 27, 2011, the Social Security Administration ("SSA") denied DeRosia's claim for benefits, finding that she was not disabled between her alleged onset date of September 3, 2009, and her date last insured, September 30, 2011.  (Tr. 106).  DeRosia requested and was granted a hearing before Administrative Law Judge Richard E. Guida, who conducted a hearing on March 19, 2012.  (Tr. 149, 176-80).  In a decision dated April 17, 2012, ALJ Guida determined that DeRosia was not disabled and was not entitled to benefits.  (Tr. 113-31).  On June 7, 2013, the Appeals Council remanded the matter for further administrative proceedings.  (Tr. 132-35).

An additional hearing was conducted before Administrative Law Judge Michael W. Devlin (the "ALJ") on February 4, 2014.  (Tr. 66-104).  DeRosia was represented at the hearing by her attorney Gregory Fassler, Esq.  (Tr. 66).  In a decision dated May 28, 2014, the ALJ found that DeRosia was not disabled and was not entitled to benefits.  (Tr. 20-40).

On December 19, 2015, the Appeals Council denied DeRosia's request for review of the ALJ's decision.  (Tr. 1-3).  DeRosia commenced this action on February 16, 2016, seeking review of the Commissioner's decision.  (Docket # 1).

---

[2]  The administrative transcript shall be referred to as "Tr. __."

## II.    Relevant Medical Evidence[3]

### A.    Treatment Records Prior to Date Last Insured

#### 1.    Unity Hospital Emergency Department Records

On July 24, 2009, DeRosia visited the Emergency Department at Unity Hospital complaining of a scratched eye. (Tr. 450-52). She was diagnosed with a corneal abrasion and discharged home with antibiotics and pain medication. (*Id.*). A few days later, DeRosia returned to the Emergency Department with a facial laceration from a dog bite. (Tr. 453-58).

On September 3, 2009, DeRosia returned to the Emergency Department complaining of a right knee injury. (Tr. 446-49). She indicated that she had twisted her knee after slipping on soap at work. (*Id.*). Her knee was tender with mild effusion and moderate pain, and she was unable to bear weight on her right knee. (*Id.*). Imaging of the knee was negative for abnormalities. (*Id.*). DeRosia was assessed to suffer from a knee sprain and was discharged home with a prescription for Naproxen. (*Id.*). After discharge, DeRosia called to complain of pain and requested stronger pain medication. (*Id.*). She was advised to follow up with her primary care physician. (*Id.*).

On December 17, 2009, DeRosia presented to the Emergency Department with alcohol intoxication. (Tr. 444-45). She reportedly had threatened her son with a knife, although she denied threatening him. (*Id.*). She was discharged with educational materials relating to alcohol intoxication. (*Id.*). On January 13, 2010, DeRosia returned to the Emergency Department complaining of severe pain due to an injured right eye. (Tr. 441-43). She was diagnosed with a corneal abrasion that impinged her visual axis. (*Id.*). She was provided antibiotics and pain medication, and advised to follow up with her ophthalmologist. (*Id.*).

---

[3] Those portions of the treatment records that are relevant to this decision are recounted herein.

## 2.     University of Rochester Medical Center

On September 16, 2009, DeRosia attended an appointment with Angela Pike
("Pike"), MSN, FNP, a member of the Occupational and Environmental Medicine Program at the
University of Rochester Medical Center ("URMC"), as a follow-up to her September 3, 2009
Emergency Department visit.  (Tr. 402-03).  DeRosia reported persistent pain at a level of ten out
of ten following her accident.  (*Id.*).  She indicated that she had been given crutches and a knee
immobilizer during her Emergency Department visit and had been unable to bear any weight on
her knee.  (*Id.*).  Upon examination, Pike noted decreased range of motion and referred DeRosia
for an appointment with Dr. Lewis, an orthopedist at URMC.  (*Id.*).

On September 18, 2009, DeRosia attended an appointment with Richard A. Lewis
("Lewis"), MD,[4] with the URMC Orthopaedics Department complaining of ongoing knee pain
from a fall at work on September 3, 2009.  (Tr. 378-79).  DeRosia reported swelling and an
inability to bear weight or fully extend her knee due to pain.  (*Id.*).  She denied any numbness or
tingling and reported that she had been taking Naproxen without relief.  (*Id.*).  According to
DeRosia, she had injured the same knee at work a few weeks earlier, but had not experienced
significant pain as a result of that injury.  (*Id.*).  She reported that previous imaging was negative
for degeneration or bony abnormalities, and that she was awaiting approval for an MRI.  (*Id.*).

Upon examination, Lewis noted grade one to grade two effusion, with a five to
ten degree extension lag with extreme pain.  (*Id.*).  DeRosia was able to flex to eighty-five
degrees with discomfort.  (*Id.*).  Lewis noted marked tenderness over the medial compartment
with palpation that was markedly aggravated with circumduction.  (*Id.*).  He also noted slight
tenderness with compression of the patella and a negative apprehension test.  (*Id.*).  Lewis

---

[4] It appears that DeRosia may have received treatment from Brian Dillenbeck, a physician's assistant,
whose evaluation and treatment plan was reviewed and approved by Lewis.  (*Id.*).  For simplicity, my decision
indicates that the treatment was provided by Lewis.

suspected that DeRosia suffered from an internal derangement, such as a meniscus tear, but needed an MRI to confirm his diagnosis. (*Id.*). In the meantime, he advised her to refrain from work until further notice and to continue modified weight bearing, icing, and treatment with Naproxen. (*Id.*).

DeRosia returned for an appointment with Lewis on December 1, 2009. (Tr. 380). She reported that she continued to experience limited mobility, swelling, and persistent pain in her right knee, although there had been some slight improvement. (*Id.*). She continued to take anti-inflammatories, but had not yet been approved for an MRI. (*Id.*). Upon examination, Lewis noted a five degree extension lag with pain, pain with flexion past 120 degrees, and localized tenderness that was markedly aggravated by any circumduction of the knee. (*Id.*). He continued to suspect a medial meniscus tear and requested authorization for an MRI. (*Id.*). He provided a prescription for a knee brace and told her that she continued to be temporarily fully disabled from work. (*Id.*).

On January 4, 2010, DeRosia returned for another appointment with Lewis. (Tr. 381-82). She indicated that the MRI request had been denied due to a pre-existing condition. (*Id.*). DeRosia reported that she had previously injured her knee approximately eight months earlier at home, but it had fully healed. (*Id.*). She re-injured it again at work before the September 3, 2009 fall. (*Id.*). She reported that she had recovered completely from that injury as well. (*Id.*). Since her fall in September 2009, she had experienced severe pain and locking. (*Id.*). Lewis opined that the competent cause of the current disability was the September 2009 fall. (*Id.*). He indicated that he was unable to move forward with treatment without an MRI and asked her to re-contact his office after providing his treatment note to Workers' Compensation. (*Id.*). He continued to rate her percentage of temporary impairment as 100%. (*Id.*).

DeRosia returned for another appointment on March 23, 2010. (Tr. 383). She still had not been approved for an MRI, and Lewis opined that Workmen's Compensation "has done this lady a[] great disservice making her walk on this knee for such a long period of time and having her treatment paralyzed by their inability to make decisions in a timely manner." (*Id.*). According to Lewis, DeRosia likely needed surgery, but would be unable to convince a surgeon to perform the procedure without an MRI. (*Id.*). Lewis recommended an MRI followed by arthroscopic intervention. (*Id.*). Lewis reiterated his diagnosis and plan after another appointment on May 7, 2010. (Tr. 384-85).

On July 26, 2010, DeRosia returned for another appointment with Lewis following an MRI. (Tr. 386-87). The MRI confirmed a torn medial meniscus with medial displacement and locking. (*Id.*). It also demonstrated a loss of cartilage. (*Id.*). Lewis opined that her care had been compromised by the insurance system's ten-month delay in approving the MRI. (*Id.*). Lewis assessed that DeRosia needed arthroscopic surgery and debridement of the loose cartilage. (*Id.*). He referred her to Michael Maloney ("Maloney"), MD, for surgery. (*Id.*).

That same day, DeRosia met with Maloney for an evaluation. (Tr. 396). Upon examination, Maloney noted tenderness to palpation over the medial joint line, negative anterior and posterior drawer, and a negative Lachman. (*Id.*). He also noted positive circumduction maneuvers with pain and clicking over the medial joint line. (*Id.*). He reviewed the MRI, which demonstrated a large vertical longitudinal tear of the right medial meniscus with displacement of the meniscus into the femoral notch. (*Id.*). Maloney opined that DeRosia needed surgical intervention; she was prescribed Vicodin for pain management until surgical approval could be obtained. (*Id.*).

On August 10, 2010, Maloney and medical resident Richard Williams, MD, performed the surgery on DeRosia's knee. (Tr. 393-94). On August 30, 2010, DeRosia met with Maloney for her first post-operative appointment. (Tr. 392). DeRosia indicated that she felt better than she had prior to surgery and was taking approximately four Vicodin daily to manage her pain, a fifty-percent decrease from the amount taken prior to surgery. (*Id.*). Maloney recommended that DeRosia engage in physical therapy and follow up in approximately three months. (*Id.*). He indicated that she continued to be fully disabled from work. (*Id.*).

DeRosia returned for another appointment with Maloney on October 13, 2010. (Tr. 391). She reported that she continued to use a cane to ambulate and to engage in physical therapy. (*Id.*). DeRosia reported some improvement, although she continued to struggle with extension and quad endurance. (*Id.*). She indicated that she needed a refill of Vicodin. (*Id.*). Maloney provided a Vicodin refill, but advised DeRosia that she would not be permitted any refills. (*Id.*). Maloney also provided DeRosia with a note to excuse her from completing community service requirements and indicated that she continued to be fully disabled from returning to work. (*Id.*).

On November 29, 2010, DeRosia attended an appointment with Jason Dahl ("Dahl"), MD, RES, a medical resident in Maloney's office. (Tr. 407). During the appointment, DeRosia complained of medial pain, but no instability, buckling or locking. (*Id.*). She continued to ambulate with a cane and was compliant with physical therapy and her home exercise program. (*Id.*). Dahl assessed that DeRosia was improving, declined to refill her Vicodin prescription, and indicated that she remained fully disabled. (*Id.*).

On December 13, 2010, DeRosia attended another appointment with Maloney. (Tr. 390). She reported attending physical therapy twice weekly with subtle improvements.

(*Id.*). Maloney noted some continued mild range of motion limitations, which he attributed to the lapse of time between her injury and surgery. (*Id.*). He advised her to continue therapy and to anticipate returning to work in approximately two months. (*Id.*).

DeRosia met with Kim Fitch ("Fitch"), PA, Maloney's physician assistant, on January 12, 2011. (Tr. 389). DeRosia complained of ongoing pain, despite attending physical therapy. (*Id.*). DeRosia reported that she had missed some therapy appointments as a result of funerals during the holidays. (*Id.*). DeRosia continued to use a cane to ambulate. (*Id.*). Upon examination, Fitch noted quadriceps atrophy and tenderness with the last few degrees of extension. (*Id.*). Fitch recommended and administered a cortisone injection to help alleviate her pain and to make physical therapy more productive. (*Id.*).

On March 3, 2011, DeRosia returned for an appointment with Meghan Lissow ("Lissow"), a physician's assistant. (Tr. 388). DeRosia reported that the cortisone injection had provided some relief; she also indicated that she had been attending physical therapy, although she had missed some appointments as a result of five more funerals. (*Id.*). DeRosia reported improvement in her quadriceps muscle strength and indicated that she was now able to curl thirty-five pounds. (*Id.*). DeRosia indicated that she continued to use a cane for ambulation and had a patellofemoral click. (*Id.*). She also complained of left knee pain due to her altered gait. (*Id.*). According to DeRosia, she was taking six ibuprofen tablets at a time, which Lissow advised was too many. (*Id.*). Upon examination, Lissow noted quadriceps atrophy, a nonantalgic gait, and medial and retropatellar pain, although DeRosia was able to fully extend without pain. (*Id.*). Lissow indicated she would request approval for an Orthovisc injection to help alleviate pain, which she anticipated would make therapy sessions more productive. (*Id.*).

DeRosia returned for an appointment with Fitch on April 13, 2011.  (Tr. 532).

DeRosia presented as teary and complained of ongoing right knee pain and also left knee pain

due to compensation when ambulating.  (*Id.*).  Upon examination, Fitch noted right knee quad

atrophy, full passive extension, flexion to ninety degrees, and tenderness medially in the

retropatellar region.  (*Id.*).  Fitch noted that they were awaiting approval for the recommended

injections and that DeRosia was participating in VESID training.  (*Id.*).

DeRosia met with Fitch again on May 11, 2011.  (Tr. 529).  Fitch informed her

that Workers' Compensation did not require approval for the Orthovisc series, although the

office still required approval before administering.  (*Id.*).  Fitch offered a cortisone injection

instead, which DeRosia declined.  (*Id.*).  Fitch declined DeRosia's request for Vicodin or

Percocet, but prescribed Ultram.  (*Id.*).  Fitch noted that DeRosia experienced pain with

prolonged sitting and standing and was unable to remain in one position for too long.  (*Id.*).

DeRosia received Orthovisc injections on June 22, June 29, and July 6, 2011.

(Tr. 518, 522, 525).  DeRosia reported no improvement from the injections and that she had been

discharged from physical therapy due to lack of improvement.  (*Id.*).  DeRosia continued to use a

cane for ambulation and was frustrated by her lack of progress.  (*Id.*).

On August 12, 2011, DeRosia attended an appointment with Maloney.  (Tr. 515).

She reported no improvement from the injections or from physical therapy.  (*Id.*).  Upon

examination, Maloney noted that she was not in acute distress and had no effusion.  (*Id.*).

DeRosia exhibited no tenderness to palpation over the medial and lateral joint lines, although she

did have some patellofemoral crepitation with range of motion.  (*Id.*).  She also exhibited pain

with extension and flexion past ninety degrees, and some pain with patellar grind.  (*Id.*).  She

was neurovascularly intact and had a negative Lachman and posterior drawer.  (*Id.*).  Imaging of

her right knee demonstrated some mild degeneration. (*Id.*). Maloney opined that DeRosia had not obtained relief from injections or therapy, that she was not a candidate for a total knee replacement given her age, and that a surgical solution was not likely due to the limited improvement in symptoms following her previous knee arthroscopy. (*Id.*). Maloney noted that DeRosia would be kept on 100% disability pending a follow-up appointment in six weeks. (*Id.*).

DeRosia returned for an appointment with Calvin Hu, a medical resident in Maloney's office. (Tr. 512). DeRosia reported that she continued to experience persistent right knee pain and planned to be assessed for vocational retraining through VESID. (*Id.*). Upon examination, DeRosia did not appear in acute distress, but demonstrated an antalgic gait favoring her right leg. (*Id.*). She had tenderness to palpation of the patella with crepitus on range of motion, although she demonstrated 0 to 100 degree range of motion without significant pain. (*Id.*). Her medical options were reviewed, and DeRosia was agreeable to attempting a repeat of the Orthovisc injections. (*Id.*). She was maintained at 100% disability. (*Id.*).

### B. Treatment Records After Date Last Insured

#### 1. University of Rochester Medical Center

##### a. Dr. Maloney

On January 20, 2012, DeRosia attended an appointment with Lissow. (Tr. 506). DeRosia reported some relief after her first round of Orthovisc injections and requested another series. (*Id.*). DeRosia also reported that she was being vocationally retrained through VESID. (*Id.*). Lissow requested authorization for another series of Orthovisc injections. (*Id.*).

DeRosia returned for an appointment with Lissow on April 12, 2012. (Tr. 625). At the time of the appointment, DeRosia had not yet been approved for additional Orthovisc injections. (*Id.*). DeRosia reported continuing to work through VESID and that she was taking

Tramadol to address her ongoing pain. (*Id.*). She also reported experiencing trigger finger of her fourth digit due to cane use and hip pain due to her altered gait. (*Id.*). Lissow provided another prescription for Tramadol and advised DeRosia to continue with the VESID program, as well as her home exercise program. (*Id.*).

On May 29, 2012, DeRosia attended another appointment with Lissow. (Tr. 622). DeRosia reported that she was no longer participating in the VESID program due to a learning disability and issues with her short-term memory. (*Id.*). At the time of the appointment, DeRosia had not been approved for another series of injections, and Lissow re-requested the necessary approval. (*Id.*).

DeRosia returned on July 11, 2012, after obtaining approval for the injections. (Tr. 617). Lissow noted that DeRosia continued to walk with a cane, which caused her to experience contralateral hip pain and trigger finger. (*Id.*). Lissow indicated that the prescription for Tramadol had been denied through Workers' Compensation, but she had sent the prescription to a new pharmacy. (*Id.*). Lissow also ordered a new cane for DeRosia and provided her a temporary handicapped parking pass. (*Id.*). Upon examination, DeRosia demonstrated full range of motion with pain. (*Id.*). Lissow administered the injection and advised DeRosia to return for additional injections. (*Id.*). The additional injections were administered on July 20, and July 30, 2012. (Tr. 609, 613).

On October 30, 2012, DeRosia attended another appointment with Lissow and reported some benefit from the injections. (Tr. 606). DeRosia reported that during a recent independent medical examination, she was advised to request a repeat injection series. (*Id.*). DeRosia also reported ongoing complications in her finger, hip, left shoulder and elbow from her use of a cane. (*Id.*). DeRosia was scheduled to begin classes the following week and expressed

concern about whether she would be able to write.  (*Id.*).  She reported ongoing pain in her knee, difficulty with range of motion, and difficulty sleeping.  (*Id.*).  DeRosia had recently attended an appointment with a primary care physician to help her manage her chronic pain.  (*Id.*).

DeRosia returned for an appointment with Lissow on January 24, 2013. (Tr. 602-03).  Lissow noted that DeRosia had not yet been approved for another series of injections and that her primary care physician had prescribed Vicodin, which reportedly provided pain relief.  (*Id.*).  DeRosia had been approved for treatment for her finger and hip and was treating with Dr. Giordano and Dr. Gonzalez for these ailments.  (*Id.*).  DeRosia also complained of left knee pain due to cane use and requested a prescription for a motorized scooter, which Lissow provided.  (*Id.*).

On April 26, 2013, DeRosia returned and met with Vamsi M. Singaraju ("Singaraju"), MBBS, FEL, for administration of a viscoelastic supplementation.  (Tr. 598-99). DeRosia reported ongoing pain, with some episodes of increased pain.  (*Id.*).  Upon examination, Singaraju noted very limited range of motion secondary to pain and no effusion.  (*Id.*).  A Synvisc-One injection was administered to DeRosia's right knee.  (*Id.*).  DeRosia was advised to follow up in ninety days.  (*Id.*).

DeRosia met with Lissow on July 19, 2013, and reported that the injection did not provide lasting relief.  (Tr. 594-95).  DeRosia reported that she had been seeing Dr. Ameduri for pain management and continued to treat with Dr. Gonzalez and Dr. Giordano for finger and left hip pain.  (*Id.*).  DeRosia recommended that DeRosia undergo another series of Orthovisc injections.  (*Id.*).  DeRosia attended another appointment with Lissow on October 17, 2013, but was advised to return after approval for the Orthovisc injections had been obtained.  (Tr. 687).

### b.     Dr. Ronald M. Gonzalez

On February 6, 2013, DeRosia attended an appointment with Ronald M. Gonzalez ("Gonzalez"), MD, at the URMC Orthopaedics and Rehabilitation Clinic, complaining of pain and stiffness in her right ring finger. (Tr. 573-74). She reported that she had been experiencing the pain for several weeks without improvement. (*Id.*). Gonzalez assessed that she suffered from trigger finger and discussed treatment options. (*Id.*). DeRosia elected a cortisone injection, which Gonzalez administered. (*Id.*).

DeRosia returned on March 7, 2013, for another appointment with Gonzalez and reported that she had not experienced significant relief with the cortisone injection. (Tr. 568-69). Gonzalez recommended a surgical release, given the progressive worsening of her finger. (*Id.*). DeRosia opted to try another injection before surgery, and Gonzalez administered the injection. (*Id.*).

DeRosia returned for another appointment with Gonzalez on April 4, 2013. (Tr. 564-65). DeRosia's finger continued to worsen, and she was unable to straighten it without using her other hand. (*Id.*). Gonzalez recommended a surgical release as soon as possible. (*Id.*). The surgical release was performed by Gonzalez on August 7, 2013. (Tr. 702-03).

DeRosia attended her first post-operative appointment on August 21, 2013. (Tr. 698). She reported minimal pain, and Gonzalez removed her sutures and observed no swelling, numbness or tingling, and full range of motion. (*Id.*). DeRosia declined hand rehabilitation. (*Id.*). DeRosia returned for another appointment on September 18, 2013. (Tr. 695). Although she had mild tenderness at the incision site, she reported that her finger was no longer triggering and that she had almost complete range of motion. (*Id.*).

On November 14, 2013, DeRosia met with nurse practitioner Christie L. Bowen ("Bowen"). (Tr. 706-07). DeRosia reported that she had been ambulating with the use of a rolling walker, but continued to experience right ring finger pain. (*Id.*). Upon examination, Bowen noted pain with passive extension and palpable crepitus with pain. (*Id.*). She recommended a cortisone injection for the persistent symptoms and noted that further surgery could be considered if the injection failed to provide relief. (*Id.*). The injection was administered, and DeRosia was advised to return in two to three months. (*Id.*). Bowen indicated that DeRosia was moderately partially disabled due to her hand impairment, but totally disabled due to her lower extremity impairments. (*Id.*).

### c.  Dr. Brian D. Giordano

On April 19, 2013, DeRosia attended an appointment with Brian D. Giordano ("Giordano"), MD, and his physician's assistant, Daniel G. Kleehammer ("Kleehammer"), PA, for evaluation of her ongoing left hip pain. (Tr. 590-91). DeRosia reported onset of left hip pain approximately six months earlier. (*Id.*). According to DeRosia, the pain did not radiate or involve numbness or tingling. (*Id.*). She was taking Tramadol for the pain, but had not engaged in physical therapy for her hip or attempted any injections. (*Id.*). Upon examination, Kleehammer noted peritochanteric pain to palpation, flexion to 110 degrees, internal rotation to twenty degrees, and external rotation to fifty degrees. (*Id.*). Imaging of the hip demonstrated mild degenerative changes and a slight dysplasia. (*Id.*). An MRI was recommended and approval for the procedure was requested from Workers' Compensation. (*Id.*).

An MRI of the left hip was conducted on April 23, 2013. (Tr. 585-86). The MRI revealed small partial thickness tears of the gluteus minimus and medius tendons at their insertions onto the greater trochanter and a paralabral cyst. (*Id.*). DeRosia met with

Kleehammer on June 3, 2013, for administration of a cortisone injection in her left hip. (Tr. 580-83).

On June 28, 2013, DeRosia returned for an appointment with Giordano. (Tr. 577-78). She reported minimal improvement from the injection and that she was desperate for an intervention that would improve her symptoms and functioning and permit her to return to work. (*Id.*). After noting that DeRosia had not improved from more conservative treatment, Giordano recommended left hip surgery. (*Id.*). He noted that Workers' Compensation would be contacted for approval. (*Id.*).

DeRosia met with Kleehammer on August 12, 2013, to discuss her upcoming hip surgery. (Tr. 677-78). Kleehammer advised DeRosia that the surgery was unlikely to completely relieve her pain, but could render her fully functional. (*Id.*). Kleehammer strongly recommended that DeRosia engage in a preoperative physical therapy appointment. (*Id.*). The surgery was performed on August 15, 2013. (Tr. 670-74).

DeRosia attended a postoperative appointment on August 23, 2013. (Tr. 665-66). Kleehammer recommended that DeRosia begin physical therapy and use crutches for ambulation. (*Id.*). Imaging of DeRosia's left hip was negative for abnormalities. (*Id.*). DeRosia indicated that she was scheduled to begin physical therapy the following Monday. (*Id.*).

Approximately one month later, DeRosia returned for an appointment with Giordano. (Tr. 661). DeRosia reported steady progress and that she was pleased with the results of the surgery. (*Id.*). Giordano recommended that she continue physical therapy and to follow up in three months. (*Id.*). Giordano indicated that DeRosia remained completely restricted from work for the time being. (*Id.*).

### 2. __Dr. Samuel Rosati__

On March 14, 2013, DeRosia met with Samuel Rosati ("Rosati"), MD, for treatment of her shoulder pain. (Tr. 552-53). Rosati expressed concern regarding DeRosia's use of narcotic medications, indicating that her last two urine screens had been negative for Vicodin, even though it had been prescribed to her. (*Id.*). DeRosia requested stronger pain medication, but Rosati indicated that he would no longer prescribe narcotics to her and advised her to seek pain management at the Pain Center or to obtain another doctor who would be willing to prescribe her narcotics. (*Id.*). Rosati prescribed a thirty-day supply of non-narcotic pain medication. (*Id.*).

### 3. __Rochester Brain and Spine__

On April 4, 2013, DeRosia attended an appointment with Clifford J. Ameduri ("Ameduri"), MD, at Rochester Brain and Spine, for a comprehensive evaluation of her right knee and right finger pain. (Tr. 653-56). DeRosia reported ongoing right knee and right finger pain since her September 2009 work injury. (*Id.*). She also indicated that she was developing left knee pain and had injured her right shoulder at the time of her fall. (*Id.*). She rated her pain at a level of nine out of ten. (*Id.*). She was currently taking ibuprofen and Tramadol to manage her pain. (*Id.*). Ameduri assessed that DeRosia suffered from joint pain in her shoulder, lower leg, and hand. (*Id.*). He agreed to assume responsibility for managing her pain medication regimen. (*Id.*).

DeRosia returned for an appointment with Ameduri on May 6, 2013. (Tr. 645-48). After a full physical examination, Ameduri assessed that DeRosia continued to suffer from joint pain in her shoulder, lower leg, and hand. (*Id.*). He noted that he had not yet

been able to obtain her medical records or imaging studies.  (*Id.*).  He advised her to return in one month and indicated that she remained temporarily completely disabled.  (*Id.*).

At her follow-up visit on June 6, 2013, DeRosia reported that she might have surgery on her left hip and on her trigger finger.  (Tr. 639-42).  She reported that the Tramadol was not providing adequate pain relief, and Ameduri decided to increase her dosage.  (*Id.*).  He also opined that her one-point cane was inadequate and wrote her a prescription for a quad cane.  (*Id.*).

On July 8, 2013, DeRosia returned for an appointment with Ameduri.  (Tr. 633-36).  She continued to complain of right knee pain, right finger pain, left hip pain, and left knee pain.  (*Id.*).  DeRosia reported that she had not obtained a quad cane and doubted that she would be able to use one.  (*Id.*).  Ameduri reordered the quad cane and advised DeRosia to try it.  (*Id.*).

DeRosia returned for an appointment with Ameduri on August 7, 2013.  (Tr. 628-30).  DeRosia had driven herself to the appointment and reported that she was scheduled for surgery on her left hip and right hand.  (*Id.*).  Her pain was at a level of seven out of ten.  (*Id.*).  She complained of left knee pain, and Ameduri observed that her gait was "quite altered."  (*Id.*).  He advised her to return after her surgeries.  (*Id.*).

Treatment notes dated November 27, 2013, suggest that DeRosia continued to suffer finger and left hip pain despite her surgeries.  (Tr. 711-14).  At the time of the appointment, DeRosia was using  a rolling walker to ambulate, but found the seat uncomfortable.  (*Id.*).  Ameduri prescribed a seat cushion for the walker and advised her to return in eight weeks.  (*Id.*).

C.    **Medical Opinion Evidence**

1.    **Richard J. DellaPorta, MD**

On November 12, 2010,[5] Richard J. DellaPorta ("DellaPorta"), MD, conducted an independent physical medical examination of DeRosia.  (Tr. 404-06).  During the evaluation, DeRosia reported a previous low back injury, which was treated surgically at Strong and did not require subsequent treatment.  (*Id.*).  She also reported injuring her right knee three times in 2009.  (*Id.*).  According to DeRosia, she first injured her knee at home and subsequently re-injured it at work.  (*Id.*).  DeRosia indicated that she was able to recover from the first two injuries without medical intervention or absence from work, although she had intermittent pain in her right knee following the second injury in June 2009.  (*Id.*).  On September 3, 2009, DeRosia suffered a third knee injury, which required her to stop working and to seek medical treatment. (*Id.*).

DeRosia reported that she was not currently working, and although she could care for her own personal hygiene, she did not participate in household chores such as cooking, cleaning, or yard work.  (*Id.*).  She estimated that she was able to stand for approximately fifteen minutes at a time with a cane.  (*Id.*).  Upon examination, DellaPorta noted that DeRosia was able to navigate the office independently and to complete the straight leg raise.  (*Id.*).  In her right knee, he noted some range of motion limitations and mild warmth without effusion or swelling. (*Id.*).

DellaPorta assessed some improvement in DeRosia's right knee, but noted that she continued to suffer some discomfort.  (*Id.*).  He opined that she suffered a moderate to marked partial disability in her right knee, but that she was capable of working full-time at a

---

[5] DellaPorta's report suggests that he had previously interviewed and examined DeRosia on July 19, 2010, although the results of that evaluation do not appear to be included in the transcript.  (Tr. 404).

"sit-down" job that would not require her to stand for more than ten to fifteen minutes at a time. (*Id.*).  He also opined that she had not yet reached maximal medical improvement and suggested that she continue physical therapy and follow up with Maloney.  (*Id.*).

DellaPorta conducted additional evaluations on June 7, 2012, September 4, 2012, March 14, 2013, and October 3, 2013.  (Tr. 536-51, 679-84).  For each evaluation, he reviewed DeRosia's treatment history and conducted a physical examination.  (*Id.*).  Generally, he maintained his opinion that DeRosia was able to work full-time at a job permitting her to sit most of the day, with limited standing and walking (no more than fifteen minutes at a time).  (*Id.*).  In his final evaluation, dated October 3, 2013, DellaPorta opined that DeRosia was completely disabled as a result of her right knee, right shoulder, right ring finger, left hip, and left knee impairments.  (*Id.*).

### 2.     Lynn Lambert, PsyD

On April 1, 2011, state examiner Lynn Lambert ("Lambert"), PsyD, conducted a consultative psychiatric evaluation of DeRosia.  (Tr. 485-90).  DeRosia reported that she currently lived with her husband, who drove her to the appointment, and her two adult sons. (*Id.*).  DeRosia also reported that she had dropped out of school in the ninth grade and had been in a regular education setting.  (*Id.*).  DeRosia had stopped working in 2009 due to physical ailments.  (*Id.*).

DeRosia reported that she had been hospitalized previously for a psychiatric disturbance after she attempted to hang herself.  (*Id.*).  DeRosia was unable to recall when the suicide attempt had occurred, although she believed it had been before 2009 and that she had been hospitalized for a week.  (*Id.*).  According to DeRosia, the incident caused her to suffer tremendous memory problems and memory loss, but she had never engaged in any outpatient

mental health treatment. (*Id.*). DeRosia reported that she had experienced nine deaths in her family over the past year. (*Id.*).

According to DeRosia, she had difficulty sleeping. (*Id.*). DeRosia reported depressive symptoms, including dysphoric moods, occasional/weekly thoughts of suicide without any plan/intent/gesture, social withdrawal, and diminished self-esteem. (*Id.*). DeRosia also reported anxiety, including excessive worry, apprehension, and restlessness. (*Id.*). According to DeRosia, her depression and anxiety had developed over the past year following several deaths in her family. (*Id.*). She also indicated that she experienced short and long-term memory impairment, occasional word-finding difficulties, and occasional concentration problems. (*Id.*).

DeRosia reported that she was able to care for her personal hygiene, manage her finances, and occasionally prepare meals, although she sometimes experienced difficulty cooking, cleaning, and doing laundry due to physical limitations. (*Id.*). According to DeRosia, she sometimes experienced forgetfulness when shopping, including forgetting to purchase items or to collect her change. (*Id.*). She reported that she socialized with her extended family and had loving and supportive family relationships. (*Id.*). She enjoyed crocheting, but sometimes forgot what she was doing and made mistakes. (*Id.*). She reported that she spent her days going to physical therapy, appointments with doctors, performing home exercises, watching movies, and talking with family members. (*Id.*). Lambert opined that DeRosia's presentation was "unusual" and at times she appeared to exaggerate her problems or to provide inconsistent information. (*Id.*).

Upon examination, Lambert noted that DeRosia appeared somewhat older than her stated age of forty-four, was neatly dressed and well-groomed, with normal motor behavior

and eye contact, and exhibited an abnormal gait characterized by a right-sided limp and use of a cane. (*Id.*). Lambert opined that DeRosia had fluent, clear speech with adequate language and slight word-finding problems, coherent and goal-directed thought processes, dysphoric affect, dysthymic mood, clear sensorium, full orientation, and below average intellectual functioning with a somewhat limited general fund of information. (*Id.*). Lambert noted that DeRosia's attention and concentration were intact. (*Id.*). DeRosia was able to perform all counting, calculation, and serial three exercises. (*Id.*). According to Lambert, DeRosia's recent and remote memory skills were impaired due to limited intellectual functioning and "possible exaggeration of problems with memory." (*Id.*). DeRosia could recall three out of three objects immediately and one out of three objects after five minutes, and could complete two digits forward and one digit backward. (*Id.*).

Lambert diagnosed that DeRosia suffered from "adjustment disorder with mixed anxiety and depressed mood (particularly post death of nine family members over the past 12 to 14 months)." (*Id.*). Lambert opined that DeRosia appeared capable of following and understanding simple directions, performing simple and certain complex tasks independently, maintaining attention and concentration, and relating adequately with others. (*Id.*). Lambert further opined that, as a result of sadness and anxiety following the death of several family members, DeRosia was mildly to moderately impaired in her ability to deal with stress and to use memory function. (*Id.*). Lambert opined that the results of DeRosia's examination were consistent with certain psychiatric symptom patterns, but did not appear to be significant enough to interfere with her ability to function on a daily basis. (*Id.*).

3.       **Melissa Brown, MD**

On April 1, 2011, state examiner Melissa Brown ("Brown"), MD, conducted a consultative internal medicine examination. (Tr. 459-63). DeRosia reported suffering from low back pain since the age of sixteen, right knee pain, short term memory loss, major depressive disorder, including a suicide attempt six years earlier that resulted in hospitalization at Strong, and left hip pain that began in 2008. (*Id.*).

DeRosia reported that the household cooking, cleaning, and laundry chores were completed by her husband and children due to her forgetfulness and inability to stand for long periods at a time. (*Id.*). DeRosia was able to assist by folding small laundry items and by grocery shopping once or twice a week using a motorized cart. (*Id.*). She reported that she was able to care for her personal hygiene, although doing so took longer since the onset of her physical impairments. (*Id.*). DeRosia reported that she enjoyed watching television, listening to the radio, reading, socializing with friends, and crocheting. (*Id.*).

Upon examination, Brown noted that DeRosia had an abnormal gait and did not appear to be in acute distress. (*Id.*). She was unable to complete the heel and toe walk or squatting. (*Id.*). She used a cane to ambulate and appeared unable to step without the cane due to weakness in her right extremity. (*Id.*). DeRosia did not need assistance to change for the examination or to get on and off the examination table and had no difficulty rising from the chair. (*Id.*).

Brown noted that DeRosia's cervical spine showed full flexion (although it appeared to trigger low back pain), extension, lateral flexion bilaterally, and rotary movement bilaterally. (*Id.*). She found that DeRosia's thoracic and lumbar spines had some range of motion limitations, but no tenderness, and the straight leg raise test was negative. (*Id.*). Brown

found full range of motion in DeRosia's shoulders, elbows, forearms, wrists, hips, and fingers bilaterally. (*Id.*). She found her right knee to be chronically flexed, with limited extension. (*Id.*). The left knee had full range of motion. (*Id.*). Brown assessed that DeRosia's hand and finger dexterity was intact, and her grip strength was five out of five bilaterally. (*Id.*). Brown reviewed an x-ray of the right knee, which she concluded was negative for abnormalities. (*Id.*).

Brown opined that DeRosia had moderate to marked limitations for prolonged standing, walking, stair climbing and kneeling, and moderate limitations for bending, lifting, carrying and overhead reaching. (*Id.*).

### 4. R. Altmansberger, Psychiatry

On April 13, 2011, agency medical consultant Dr. R. Altmansberger ("Altmansberger") completed a Psychiatric Review Technique. (Tr. 465). Altmansberger concluded that DeRosia's mental impairments were not severe. (*Id.*).

### 5. Tara Russow, PhD

On December 12, 2011,[6] Russow conducted a comprehensive evaluation of DeRosia's intellectual, personality, and neuropsychological functioning upon a referral from a vocational rehabilitation program. (Tr. 491-503). During the evaluation, DeRosia recounted her educational history and indicated that she had completed the ninth grade in a regular education setting and had no identified learning disabilities. (*Id.*).

DeRosia also recounted her work history and indicated that she had last worked in a maintenance position at a fitness center, a position that ended in 2009 after five years. (*Id.*). DeRosia reported previous criminal charges, including petit larceny and DWI. (*Id.*). She also indicated that she had been hospitalized after a suicide attempt that occurred approximately

---

[6] Although this evaluation was conducted after the date last insured, the ALJ determined that the evaluation "was close enough to that date to presume that the conditions Dr. Russow identified manifested prior to the date last insured." (Tr. 32).

seven to ten years earlier.  (*Id.*).  She was unable to recall where she had been hospitalized or where she had attended one outpatient appointment after her discharge.  (*Id.*).  DeRosia suspected that she had suffered an undiagnosed traumatic brain injury during her suicide attempt, during which she lost consciousness and experienced hypoxia.  (*Id.*).  According to DeRosia, she had suffered significant memory impairments since the suicide attempt.  (*Id.*).

DeRosia reported that she had lost approximately ten relationships during the previous three months and had experienced sadness, crying spells, sleep disruption, helplessness, rumination, and social withdrawal during that period.  (*Id.*).  According to Russow, cognitive concerns included diminished immediate, short-term and long-term recall difficulties, distractibility, "slowed thinking," and right-left confusion.  (*Id.*).  Emotional concerns included situational stress, tension, anxiety, worry, and the depressive indicators endorsed by DeRosia. (*Id.*).

Upon examination, Russow noted that DeRosia appeared casually dressed, with appropriate eye contact and orientation (although she had difficulty stating her location), alert and cooperative demeanor, fluid and goal-directed speech, logical and organized thought processes, a dysphoric mood, and appropriate affect.  (*Id.*).  According to Russow, DeRosia demonstrated impaired memory.  (*Id.*).  Personality testing results were determined to be statistically invalid due to DeRosia's failure to endorse items that a non-clinical population would be expected to endorse.  (*Id.*).  DeRosia demonstrated a Full Scale Intelligence Quotient of 76, which placed her in the borderline range of intelligence.  (*Id.*).  Further testing demonstrated "deficits in most core academic skills assessed."  (*Id.*).  The NAB testing results demonstrated a mild to moderate degree of brain dysfunction, with her scores falling in the mildly to moderately impaired range.  (*Id.*).  Based upon these scores, Russow assessed that DeRosia's attention was

moderately to severely impaired, her language abilities were mildly impaired, her memory was average, her spatial skills were mildly to moderately impaired, and her executive functioning was below average. (*Id.*).

Russow diagnosed DeRosia with cognitive disorder, not otherwise specified due to strangulation hypoxia, depressive disorder, not otherwise specified with dysthymia major depressive episodes and bereavement, and borderline intellectual functioning. (*Id.*). According to DeRosia, Russow's ongoing psychological symptoms were mild to moderate. (*Id.*). Russow attributed DeRosia's memory impairments to her suicide attempt, but suspected that Russow had suffered from some pre-existing cognitive deficits, functional factors, and idiopathic subclinical structural etiologies. (*Id.*).

With respect to her vocational issues, Russow noted that DeRosia would benefit from a functional capacity evaluation to determine her physical tolerance for work-related tasks and a community-based vocational assessment to refine her aptitudes and interests. (*Id.*). Russow suggested that supported employment or job coaching services should be considered if DeRosia had difficulty with competitive employment in the open workforce. (*Id.*).

III. **Non-Medical Evidence**

In her application for benefits, DeRosia reported that she was born in 1966. (Tr. 282). DeRosia reported that she had completed the ninth grade and had previously been employed as a baker, cleaner, prep cook, and stock person. (Tr. 286-87). According to DeRosia, her last employment ended in 2009 due to her impairments. (Tr. 286).

DeRosia reported that she lived with her family, did not care for any family members or pets, and was able to care for her own personal hygiene with some assistance

shaving and getting in and out of the bathtub. (Tr. 312-14). DeRosia reported that she was

unable to prepare meals due to pain, but was able to fold laundry from a seated position.

(Tr. 314-15). According to DeRosia, her husband and children prepared the meals and

completed the household chores. (*Id.*). DeRosia reported that she left the house to attend

physical therapy appointments, shop, and go to the video store. (Tr. 315). According to

DeRosia, she used a motorized cart to shop and needed assistance carrying bags. (*Id.*). DeRosia

was unable to drive and did not have a driver's license. (Tr. 315-16).

DeRosia reported that she was unable to manage household finances and enjoyed

watching television, crocheting, eating, and roller blading, but was unable to engage in many of

these activities due to her impairments. (Tr. 316-17). She indicated that she spent time with

others and did not have any difficulty getting along with them. (*Id.*).

According to DeRosia, her medical conditions limited her ability to lift, stand,

walk, navigate stairs, kneel, squat, and use her hands. (Tr. 317-18). DeRosia reported using a

cane prescribed by her doctor to assist with ambulation. (Tr. 319-20). She was unable to

estimate how far she could walk before needing a break. (*Id.*). In addition, DeRosia reported

difficulty with short-term memory and completing tasks. (*Id.*).

According to DeRosia, she had suffered from constant radiating pain in her back,

knee, thigh, and hip since her injury in 2009. (Tr. 320-21). According to DeRosia, movement

exacerbated her pain. (*Id.*). DeRosia took over-the-counter ibuprofen to manage her pain. (*Id.*).

DeRosia indicated that she previously managed her pain with Vicodin, but her doctor

recommended switching to ibuprofen to avoid addiction. (Tr. 321-22).

During her first administrative hearing on March 19, 2012, DeRosia testified that

her main impairment was her right knee injury, which had not been adequately addressed by her

surgery in August 2010.  (Tr. 46-47).  DeRosia testified that she needed a cane to ambulate.

(*Id.*).  She also testified that she had experienced pain and locking in her right hand, possibly

from cane use, for the previous three weeks.  (Tr. 50, 56).  DeRosia believed that her mental

impairments, particularly her memory, would preclude her ability to work in a job that required

prolonged sitting.  (Tr. 47-48).  According to DeRosia, she had experienced difficulties with

memory ever since she had attempted suicide, which she recalled was "a long time" before her

2009 knee injury.  (Tr. 48-49).  DeRosia was not receiving any mental health treatment due to

her lack of insurance.  (Tr. 49).

DeRosia lived at home with her husband and two adult sons.  (Tr. 50).  Her

husband collected disability benefits due to a neck injury.  (*Id.*).  During the day, DeRosia

enjoyed watching television, and was able to read and write, although her hand pain made

writing difficult.  (Tr. 51-52).  Her husband assisted her with paperwork and comprehending

certain vocabulary words.  (*Id.*).  DeRosia testified that she was able to perform simple addition

and subtraction, but that her husband handled all the finances.  (Tr. 52-53).  DeRosia did not

drive and had never obtained a driver's license.  (Tr. 53).

DeRosia testified that she had completed the ninth grade, but had never obtained

her GED.  (Tr. 54).  She experienced sad feelings and mainly socialized with her immediate

family.  (Tr. 54-55).  DeRosia explained that she had difficulty remembering things and

sometimes had difficulty following conversations.  (Tr. 55-56).  She was unable to assist with

household chores and experienced difficulty sleeping due to her knee pain.  (Tr. 56-57).  She

testified that she had to shift positions when sitting in order to address aching in her knees, and

she sometimes reclined with a pillow under her knee to alleviate pain.  (Tr. 57-58).  She

indicated that she sometimes experienced pain and cramps when she stood up after sitting for a long period. (Tr. 58-59).

During her second administrative hearing on February 4, 2014, DeRosia testified that she was forty-seven years old and continued to live at home with her husband and adult sons. (Tr. 70). She testified that despite taking GED classes, she had not obtained her GED. (Tr. 71-72). She previously had been employed as a cleaner at an athletic club until her injury in 2009. (Tr. 72). She also had previously been employed stocking shelves, making bagels, and as a prep cook. (Tr. 73-74).

DeRosia testified that she initially received treatment for her knee from Lewis, who assisted her with obtaining surgery approval through Workers' Compensation. (Tr. 74-75). Lewis prescribed pain medication, a knee brace, and a cane. (Tr. 75-76). He opined that DeRosia was not able to return to work. (Tr. 76). Lewis then referred DeRosia to Maloney for surgery. (Tr. 75). According to DeRosia, Maloney administered Orthovisc injections to her knee. (Tr. 76-77). DeRosia testified that she also engaged in physical therapy. (Tr. 77).

According to DeRosia, her pain was exacerbated by walking. (Tr. 78). She estimated that she could walk for approximately five to ten minutes before experiencing increased pain. (Tr. 78, 85). She also indicated that sitting for more than fifteen minutes caused her knee to "lock up." (Tr. 79). As a result, she sometimes had difficulty rising from a seated position. (*Id.*).

DeRosia testified that her left knee began aching after the surgery on her right knee. (Tr. 80). According to DeRosia, her doctor had opined that her use of the cane had caused her left knee pain. (*Id.*). DeRosia testified that her cane use had also caused her to suffer impairments to her hip, hand, and shoulder. (Tr. 81). DeRosia testified that she began to

experience symptoms in her hand and knee within months of starting to use the cane. (Tr. 82). She later testified that she experienced the onset of her hip, shoulder, hand and left knee pain after June 2011. (Tr. 91).

With respect to her hand, DeRosia indicated that her finger had started to lock up and she had trigger finger surgery to correct the problem. (Tr. 81-82). Despite surgery, she continued to be unable to make a fist and had difficulty writing, crocheting, and picking up objects. (Tr. 82-83). DeRosia testified that she now used a walker instead of a cane to assist with mobility. (Tr. 84). According to DeRosia, she would be unable to stand or walk without the use of her walker. (Tr. 86). She indicated that she had hip surgery "more recently." (Tr. 86-87).

DeRosia testified that she also experienced memory difficulties and that testing had demonstrated that she was mildly retarded. (Tr. 88). According to DeRosia, she was unable to type or to complete online employment applications, had difficulty reading, and was unable to manage the household finances or to multiply without a calculator. (Tr. 89-90).

Vocational expert, Julie Andrews ("Andrews"), also testified during the hearing. (Tr. 93-103). The ALJ first asked Andrews to characterize DeRosia's previous employment. (Tr. 93). According to Andrews, DeRosia previously had been employed as a commercial cleaner and a kitchen helper. (Tr. 94-95).

The ALJ asked Andrews whether a person would be able to perform DeRosia's previous jobs who was the same age as DeRosia, with the same vocational profile, and a limited ninth grade education, and who could perform the full range of sedentary work, including occasionally lifting or carrying ten pounds, frequently lifting and carrying less than ten pounds, standing or walking at least two hours per day and sitting about six hours per day, occasionally

pushing or pulling ten pounds, occasionally climbing ramps and stairs, occasionally balancing and stooping, but could never kneel, crouch, crawl or climb ladders, ropes, or scaffolds, and had to be permitted to use an assistive device to ambulate to and from a work station. (Tr. 95-96). Andrews testified that such an individual would be unable to perform the previously-identified jobs, but would be able to perform other positions in the national economy, including order clerk and brake linings coater. (Tr. 96-97). The ALJ then added the additional limitation of never reaching overhead bilaterally, and Andrews testified that those two positions would still be available. (*Id.*).

The ALJ next asked Andrews to assume the same limitations, but to add the additional mental limitations of being able to understand, remember and carry out only simple instructions and tasks, occasionally interacting with the general public, and being able to maintain concentration and focus consistently for up to two hours at a time. (Tr. 97). Andrews testified that such an individual could perform the brake linings coater position, but not the order clerk position. (*Id.*). Andrews indicated that such an individual would be able to perform the position of label pinker. (*Id.*).

The ALJ asked Andrews to assume also that the individual could only occasionally finger with the dominant right hand. (Tr. 98). Andrews responded that the label pinker position would be eliminated, but the individual would be able to perform the brake linings coater position, as well as a preparer position. (*Id.*).

DeRosia's attorney then posed another hypothetical, asking Andrews to assume that the individual's ability to focus and concentrate would be off-task for ten percent of the work day. (Tr. 99). Andrews responded that such a limitation would preclude competitive employment. (Tr. 99-100). DeRosia's attorney asked whether competitive employment would

also be precluded if an individual required repeated instructions, outside of a typical training

period, in order to complete tasks. (Tr. 100-101). Andrews responded affirmatively. (*Id.*).


## DISCUSSION

### I.    Standard of Review

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is

defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

(1)    whether the claimant is currently engaged in substantial gainful activity;

(2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)     if not, whether the claimant retains the residual functional
        capacity to perform any other work that exists in significant
        numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.     **The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims. (Tr. 23-35). Under step one of the process, the ALJ found that DeRosia had

not engaged in substantial gainful activity between September 3, 2009, the alleged onset date,

and September 30, 2011, her date last insured. (Tr. 25). At step two, the ALJ concluded that

DeRosia had the severe impairments of osteoarthritis of the right knee, status post-meniscal

repair of the right knee with residual pain, obesity, adjustment disorder with mixed anxiety and

depressed mood, depressive disorder, cognitive disorder, not otherwise specified, and borderline

intellectual functioning. (Tr. 26). The ALJ determined that DeRosia's alleged impairments,

including right ring trigger finger, right shoulder bursitis, and a labral tear of the hip with mild

degenerative changes did not occur before her date last insured. (*Id.*). The ALJ also determined

that DeRosia's lower back pain and left knee pain did not constitute medically determinable

impairments. (*Id.*). At step three, the ALJ determined that DeRosia did not have an impairment

(or combination of impairments) that met or medically equaled one of the listed impairments

through her date last insured. (Tr. 27-29). With respect to DeRosia's mental impairments, the

ALJ found that DeRosia suffered from moderate difficulties in maintaining concentration,

persistence or pace, and mild limitations in social functioning and activities of daily living. (*Id.*). The ALJ concluded that through the date last insured DeRosia had the residual functional capacity ("RFC") to understand, remember and carry out simple instructions and tasks, frequently interact with coworkers and supervisors, occasionally have contact with the general public, consistently maintain concentration and focus for up to two hours at a time, and to perform less than the full range of sedentary work, including occasionally lifting and/or carrying ten pounds, frequently lifting and/or carrying less than ten pounds, standing and/or walking at least two hours and sitting about six hours of an eight-hour workday, except that DeRosia needed an assistive device to ambulate to and from her workstation, could only occasionally push and/or pull ten pounds, climb ramps and/or stairs, balance, and stoop, and could never reach overhead bilaterally, kneel, crouch, crawl, or climb ladders, ropes or scaffolds. (Tr. 29-33). At steps four and five, the ALJ determined that through her date last insured DeRosia was unable to perform past work, but could perform other jobs in the local and national economy, including brake linings coater and label pinker. (Tr. 33-34). Accordingly, the ALJ found that DeRosia was not disabled. (Tr. 34-35).

   B.    **DeRosia's Contentions**

        DeRosia contends that the ALJ's RFC determination is not supported by substantial evidence and is the product of legal error. (Docket # 8-1). DeRosia's specific challenges to the ALJ's decision are not clearly articulated and are difficult to identify. The Court has endeavored as best it can to identify the specific issues raised by DeRosia. First, DeRosia appears to argue that the ALJ failed to properly consider whether the onset of some of her impairments predated her date last insured. (Docket ## 8-1 at 29-31; 15 at 6-7). Next, DeRosia maintains that the ALJ's physical RFC analysis was flawed because the ALJ failed to

properly apply the treating physician rule and to consider the record as a whole. (Docket ## 8-1 at 32-35; 15 at 2-3, 5-6). DeRosia also maintains that the ALJ's mental RFC assessment fails to account for the limitations assessed by Russow. (Docket ## 8-1 at 35; 15 at 4-5). Finally, DeRosia also maintains that the ALJ failed to properly assess her credibility. (Docket ## 8-1 at 33-35; 15 at 6-7).

## II.    **Analysis**

### A.    **Onset of Impairments**

DeRosia challenges the ALJ's determination that several of her impairments did not exist prior to her date last insured. (Docket # 8-1 at 29). As an initial matter, DeRosia appears to suggest that the ALJ concluded that the record failed to establish that she suffered from knee pain, memory and concentration deficits, and other mental limitations prior to the date last insured. (*Id.* at 29-30). This mischaracterizes the ALJ's decision. The ALJ specifically recognized that the evidence demonstrated that DeRosia suffered from severe impairments prior to her date last insured, including right knee impairments, cognitive impairments, and mental health impairments. (Tr. 26). He also recognized that DeRosia complained of back pain and left knee pain prior to the date last insured, but concluded that these did not constitute medically determinable impairments.[7] (*Id.*).

With respect to DeRosia's right hand, right shoulder, and hip impairments, DeRosia is correct that the ALJ concluded that there was no evidence of complaints to her

---

[7] It is unclear whether DeRosia challenges the ALJ's conclusion that her back pain and left knee pain were not medically determinable impairments. To the extent she does, such challenge is unavailing. Simply stated, there is no objective evidence in the record documenting treatment for any back or left knee impairments prior to the date last insured. While there are several references to left knee pain or a pre-existing back impairment contained in the record (Tr. 388, 459, 462, 485, 532, 680), nothing suggests that DeRosia suffered limitations from such conditions or sought any treatment relating to such conditions after the alleged onset date and prior to the date last insured. Accordingly, I find that the ALJ's conclusion that DeRosia's left knee and low back pain were not medically determinable is supported by substantial evidence in the record.

treatment providers or treatment for these impairments until after the date last insured. (*Id.*). DeRosia apparently challenges the ALJ's conclusion that these impairments did not occur prior to her date last insured. (Docket # 8-1 at 31). According to DeRosia, the record evidence demonstrates that these impairments were caused by her cane use attributed to her right knee impairment and thus constitute progressive injuries for which a definitive onset date is difficult to determine. (Docket ## 8-1 at 30-31; 15 at 7). According to DeRosia, the ALJ failed to properly apply Social Security Ruling 83-20 in determining that these impairments post-date her date last insured. (*Id.*). At the very least, DeRosia maintains, the ALJ should have considered the subsequent impairments in evaluating the severity of her right knee injury prior to her date last insured. (*Id.*).

Unlike Supplemental Security Income, DIB requires that a claimant show that she became disabled during a period when she was insured. *See* 42 U.S.C. §§ 423(a)(1) and (c)(1); *see also Tavarez v. Astrue*, 2012 WL 2860797, *2 (E.D.N.Y. 2012). Accordingly, DeRosia is precluded from claiming entitlement to DIB benefits for conditions that did not exist until after her date last insured. *See Roman v. Astrue*, 2012 WL 4566128, *6 n.13 (E.D.N.Y. 2012). The ALJ carefully considered the references in the record to DeRosia's complaints of and treatment for her right hand, hip, and shoulder. (Tr. 26). Specifically, he noted that she did not begin to complain of these impairments until April 2012 (when she complained to Lissow about trigger finger and hip pain), well after her date last insured. (*Id.*).

Although the ALJ recognized that the evidence suggested that these impairments stemmed from the use of her cane and thus were related to DeRosia's right knee impairment, he concluded that the fact that the injuries were related did not mean that the impairments existed during the relevant period. (*Id.*). Rather, the ALJ properly recognized that the record did not

suggest that DeRosia suffered from these impairments prior to her date last insured. DeRosia

maintains that this conclusion was erroneous, but fails to cite to any record evidence to the

contrary; indeed, records from her treatment providers do not document any complaints

stemming from these impairments until well after DeRosia's insured-status expired.[8] Although

the record reflects that DeRosia complained to the orthopedic consultative examiner in April

2011 about hip pain that she said had started in 2008 (before the September 2009 knee injury)

(Tr. 459-64), the record also documents that she told Dr. Giordano in April 2013 that the hip pain

had begun in approximately October 2013 (Tr. 590). On this record, I conclude that substantial

evidence supports the ALJ's conclusion that DeRosia did not suffer from these impairments prior

to her date last insured. *See*, *e.g.*, *Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989) ("regardless

of the seriousness of his present disability, unless [p]laintiff became disabled before [his date last

insured], he cannot be entitled to benefits"); *Roman v. Astrue*, 2012 WL 4566128 at *6 n.13

("[p]laintiff may not claim eligibility for disability insurance benefits based on sleep apnea, a

condition that was not established until after the date last insured"); *Camacho v. Astrue*, 2010

WL 114539, *4 (W.D.N.Y. 2010) ("[t]he seriousness of [p]laintiff's renal failure after his date

last insured is not disputed, however, it cannot qualify [p]laintiff for DIB unless he was disabled

prior to his date last insured").

**B.    RFC Assessment**

An individual's RFC is his "maximum remaining ability to do sustained work

activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198

F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)). In making

---

[8]    Although DeRosia correctly maintains that the absence of contemporaneous treating records does not preclude a claimant from demonstrating that she suffered from a prior disability (Docket # 8-1), DeRosia's argument on this point misses the mark. In this case, there *are* contemporaneous treatment notes, and they fail to contain any complaints, treatment, or diagnoses relating to these impairments. Further, the subsequent treating notes diagnosing and providing treatment for the impairments do not suggest or establish that the impairments existed prior to DeRosia's date last insured.

an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)). "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

### 1.        Physical RFC Assessment

DeRosia's principal challenge to the ALJ's physical RFC assessment appears to be that the ALJ improperly applied the treating physician rule, resulting in a flawed RFC. (Docket ## 8-1 at 27-28, 34-35; 15 at 2-3, 7-8). According to DeRosia, the ALJ failed to provide good reasons for rejecting the opinions of her treating physicians and improperly accorded more weight to the opinions of the consulting physicians. (*Id.*).

Generally, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2)[9]; *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010) ("the ALJ [must] give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence"). Thus, "[t]he opinion of a treating physician is generally given greater weight than that of a consulting physician, because the treating physician has observed the patient over a longer period of time and is able to give a more detailed picture

---

[9] This regulation applies to claims filed before March 27, 2017. For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c apply.

of the claimant's medical history." *Salisbury v. Astrue*, 2008 WL 5110992, *4 (W.D.N.Y. 2008).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must explicitly consider:

(1)    the frequency of examination and length, nature, and extent of the treatment relationship,

(2)    the evidence in support of the physician's opinion,

(3)    the consistency of the opinion with the record as a whole,

(4)    whether the opinion is from a specialist, and

(5)    whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x at 199. The regulations also direct that the ALJ should "give good reasons in [his] notice of determination or decision for the weight [he] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d at 32 (quoting 20 C.F.R. § 404.1527(c)(2)). "Even if the above-listed factors have not established that the treating physician's opinion should be given controlling weight, it is still entitled to deference, and should not be disregarded." *Salisbury v. Astrue*, 2008 WL 5110992 at *4. The same factors should be used to determine the weight to give to a consultative physician's opinion. *Tomasello v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. 2011). "However, if the treating physician's relationship to the claimant is more favorable in terms of the length, nature and extent of the relationship, then the treating physician's opinion will be given more weight than that of the consultative examining physician." *Id.*

In his decision, the ALJ reviewed and considered the treating notes provided by DeRosia's treating providers, including their statements that DeRosia was 100% disabled from returning to work. (Tr. 30). In doing so, the ALJ acknowledged that all of DeRosia's treating providers consistently concluded that she was fully disabled from returning to work beginning in 2009 through DeRosia's date last insured. (*Id.*). He also recognized that DeRosia's treating providers continued to document full disability for DeRosia after her date last insured. (*Id.*). The ALJ acknowledged the treating relationship that DeRosia had with these providers, but accorded their conclusions regarding her total disability "limited weight" because they were conclusory, did not provide function-by-function assessments of DeRosia's work-related capabilities, and were based upon Workers' Compensation guidelines as opposed to Disability guidelines. (*Id.* at 30-31). By contrast, the ALJ gave "significant weight" to the opinions provided by DellaPorta and Brown in assessing DeRosia's physical RFC. (*Id.* at 31). DeRosia maintains that the ALJ erred in weighing the opinion evidence. I disagree.

As an initial matter, the ALJ correctly concluded that the providers' conclusory statements that DeRosia was 100% disabled constitute opinions on an issue reserved to the Commissioner. As recognized by the ALJ, none of the treating providers assessed DeRosia's capacity to perform work-related functions; rather, they merely provided conclusory statements concerning her ability to return to work. Such opinions are not entitled to any special significance. *See DiCarlo v. Colvin*, 2016 WL 4734633, *14-15 (E.D.N.Y. 2016) ("[treating physician's] statements that the [p]laintiff was 'fully disabled' for Workers' Compensation purposes are not medical opinions that would come within the purview of the [t]reating [p]hysician [r]ule[;] [t]hey are, instead, conclusory statements regarding the ultimate issue in the case"); *Laney v. Colvin*, 2016 WL 519037, *3 (W.D.N.Y. 2016) (treating physician's assessment

that plaintiff was 100% impaired "is unsupported by any further detail, and is not a medical opinion entitled to any special significance, but is instead a determination within the purview of the Commissioner") (internal quotations omitted); *Ackley v. Colvin*, 2015 WL 1915133, *5 (W.D.N.Y. 2015) (ALJ did not err in weighing treating physician's statements of total disability for Workers' Compensation purposes; "[g]iven that the determination of whether an individual is disabled is unequivocally a matter reserved for the Commissioner, the ALJ therefore did not err in his assessment of those opinions"); *see also Raymer v. Colvin*, 2015 WL 5032669, *4 n.4 (W.D.N.Y. 2015) ("the ALJ was not obligated to accord significant weight to [treating physician's] conclusory opinions that [plaintiff's] medical impairments prevented him from working") (collecting cases).

Further, the ALJ also correctly recognized that the Workers' Compensation guidelines applied by the providers in reaching their conclusions "do not necessarily coincide with disability regulations" and are not binding. (Tr. 31). Rather, "it is well settled law that an ALJ need not give controlling weight to a treating physician's opinions concerning a claimant's 'disability' in connection with a Worker's Compensation proceeding." *DeJesus v. Barnhart*, 2007 WL 528895, *14 (W.D.N.Y. 2007); *see DiCarlo v. Colvin*, 2016 WL 4734633 at *15 ("courts have consistently recognized that the disability standards under the Social Security Act and New York Workers' Compensation Law are markedly distinct; therefore an opinion of disability rendered for purposes of workers' compensation is not binding under the Social Security Act") (internal quotations omitted).

Although the ALJ determined that the treating providers' conclusions relating to disability were not entitled to any special weight, he did not ignore them altogether. Rather, he reviewed the providers' treatment notes at length, acknowledged that DeRosia's providers

consistently concluded that she was fully disabled throughout the relevant time period, and considered those statements in the context of his comprehensive review of the record as a whole in assessing DeRosia's RFC. (Tr. 29-33).

In doing so, the ALJ also properly considered the opinions provided by DellaPorta and Brown and determined that those opinions were entitled to "significant weight." (Tr. 31). Contrary to DeRosia's contentions, the ALJ did not err by according more weight to their opinions because they were issued following single examinations by each.[10] (Docket ## 8-1 at 34; 15 at 2-3). Such arguments have been rejected by this Court, and the record in this case compels the same conclusion. *See Fuentes v. Colvin*, 2015 WL 631969, *8 (W.D.N.Y. 2015) ("I disagree that [the consulting examiner] is not entitled to 'great weight' because she only examined [claimant] on one occasion[;] [t]he opinion of a consultative examiner can constitute substantial evidence supporting an ALJ's decision") (internal quotations omitted).

It appears that DeRosia also challenges the ALJ's physical RFC assessment on the grounds that it is not supported by substantial evidence. According to DeRosia, the ALJ's conclusion that she is capable of standing or walking for at least two hours in a workday and occasionally climbing ramps and/or stairs, balancing, and stooping is not supported by the record evidence and is inconsistent with the limitations assessed by DellaPorta and Brown. (Docket ## 8-1 at 35; 15 at 5). I disagree.

---

[10] DeRosia maintains that it was inconsistent for the ALJ, on the one hand, to reject the opinions of her treating providers on the grounds that their conclusion was based upon Workers' Compensation standards and, on the other hand, to credit DellaPorta's opinion, which also applied Workers' Compensation standards. (Docket # 15 at 3). Yet, as noted above, the treating providers' statements were wholly conclusory and did not provide any assessment of DeRosia's ability to engage in work-related functions. In contrast, DellaPorta's opinion provides functional assessments of DeRosia's ability to sit, stand, and walk.

DeRosia also attacks DellaPorta's opinion because he failed to assess DeRosia's mental impairments. (*Id.*). DellaPorta's evaluation, however, was clearly limited to an assessment of DeRosia's physical impairments.

After performing a comprehensive physical examination, Brown assessed that DeRosia suffered from a moderate to marked limitation for prolonged standing and walking, as well as stair climbing and kneeling. (Tr. 462). Such limitations are consistent with the ALJ's conclusion that DeRosia retains the ability to perform the exertional requirements of sedentary work with some additional modifications. (Tr. 29-33). In general, sedentary work requires the ability to lift up to ten pounds at a time, to lift and carry light objects occasionally, to stand and walk up to two hours per workday, and to sit for up to six hours of an eight-hour workday. *See Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (citing 20 C.F.R. § 404.1567(a)). I conclude that the ALJ's determination that DeRosia was capable of performing sedentary work with some postural limitations provided she was permitted to use an assistive device to ambulate was well-supported by the opinions of DellaPorta and Brown and the other record evidence.

As an initial matter, "several courts have upheld an ALJ's decision that the claimant could perform light or sedentary work even when there is evidence that the claimant had moderate difficulties in prolonged sitting or standing." *Carroll v. Colvin*, 2014 WL 2945797, *4 (W.D.N.Y. 2014); *Harrington v. Colvin*, 2015 WL 790756, *14 (W.D.N.Y. 2015) ("other courts do not consider an opinion assessing moderate limitations for sitting, standing and walking inconsistent with a determination that the claimant can perform the requirements of light or medium work") (collecting cases). Accordingly, Brown's assessment of moderate to marked limitations for prolonged standing and walking is not inconsistent with the ALJ's conclusion that DeRosia could perform the exertional requirements of sedentary work. Additionally, I find that Brown's assessment of moderate to marked limitations for stair climbing and kneeling is consistent with the ALJ's conclusion that DeRosia could only occasionally climb stairs and could never kneel. The ALJ's conclusions are further supported by DellaPorta's opinion that

DeRosia was physically capable of working full-time so long as the position allowed her to be seated most of the workday.

In conclusion, I find that the ALJ's physical RFC assessment was supported by substantial evidence. Although the record plainly reflects that DeRosia suffered from ongoing right knee pain, which was not completely alleviated by surgery, injections, and physical therapy, little in the record suggests that prior to her date last insured she was unable to perform the exertional limitations of sedentary work with postural limitations and the ability to use her cane. Indeed, DeRosia's statements regarding her activities of daily living are generally consistent with the RFC adopted by the ALJ. According to DeRosia, she was able to care for her personal hygiene, perform household and other activities, including folding laundry watching television, and crocheting, so long as she was seated. The ALJ's RFC accounted for DeRosia's physical impairments by limiting her to sedentary work that permitted her to use a cane and to refrain from kneeling, crouching, crawling, or more than occasional stair climbing. Thus, the ALJ's RFC assessment was reasonable and supported by substantial evidence. *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) ("[u]pon our independent review of the existing record, including [the consultative examiner's opinion] and the treatment notes from [plaintiff's] doctors, we conclude that the ALJ's residual functional capacity determination was supported by substantial evidence").

### 2. Mental RFC Assessment

I turn next to DeRosia's contention that the ALJ failed to account for the attention, concentration and memory limitations assessed by Russow. (Docket ## 8-1 at 35; 15 at 4-5). Specifically, DeRosia maintains that the ALJ's RFC assessment failed to account for Russow's opinion that DeRosia suffered from moderate to severe limitations in her ability to

maintain attention and concentration and from significant memory deficits.  (*Id.*).  According to

DeRosia, these deficits are inconsistent with the ALJ's conclusion that she can maintain attention

and concentration for up to two hours at a time.[11]  (*Id.*).

Having carefully reviewed the ALJ's decision and the evidence relating to

DeRosia's mental impairments, I disagree that the ALJ failed to account for the attention,

concentration and memory limitations assessed by Russow.  In his decision, the ALJ thoroughly

discussed Russow's opinion and specifically noted that the testing administered by Russow

demonstrated that DeRosia exhibited "moderate to severe impairment in attention" and that

Russow found "attention/concentration deficits that exceed those indicated by Dr. Lambert."

(Tr. 32-33).  The ALJ also noted that the memory limitations identified by Russow supported the

memory deficits observed by Lambert.  (Tr. 33).

After comprehensively reviewing the record, including the medical opinions of

DeRosia's mental capabilities provided by Lambert and Russow, the ALJ concluded that

DeRosia was capable of simple work so long as she had limited contact with others and would

not be expected to maintain concentration and attention for more than two hours at a time.

(Tr. 29-33).  Russow's opinion is not necessarily at odds with the ALJ's limitations.  *See Ross v.

Colvin*, 2015 WL 1189559, *11 (W.D.N.Y. 2015) ("[c]ontrary to [plaintiff's] contention, I

conclude that the ALJ incorporated [the consultant's] opinion into his RFC assessment by

including the limitation that [plaintiff] could only sustain attention and concentration for up to

two hours at a time"); *Buscemi v. Colvin*, 2014 WL 4772567, *14 (W.D.N.Y. 2014) (ALJ

adequately accounted for attention and concentration limitations in the RFC assessment "by

---

[11]  DeRosia's submission also appears to suggest that Russow concluded that DeRosia would require a
supported or assisted working environment, which would preclude competitive work.  (Docket # 15 at 4).  DeRosia
also suggests that the government conceded that Russow's report should be interpreted as requiring a supported or
assisted working environment.  (*Id.*).  To the contrary, as the government recognized, Russow's report merely stated
that a supported work environment should be considered in the event that DeRosia attempted, but was ultimately
unable to succeed in a regular competitive employment environment.  (Tr. 497).

incorporating the limitation that [claimant] could only sustain attention and concentration for up to two hours at a time").  DeRosia has failed to provide any support for her contention that Russow's assessment of her concentration and attention limitations required the ALJ to incorporate more restrictive limitations than he did.

Moreover, nothing in the record suggests that DeRosia's mental impairments would prevent her from performing unskilled work with the limitations identified by the ALJ. Indeed, as recognized by the ALJ, the record reflects that DeRosia was able to engage in activities of daily living requiring attention and concentration, including watching television, reading, crocheting, and grocery shopping.  Further, his RFC assessment is fully supported by Lambert's opinion that DeRosia was capable of maintaining attention and concentration and that she suffered only mild to moderate limitations with her memory.  Significantly, Russow attributed DeRosia's memory and cognitive difficulties to her suicide attempt, which occurred well before her alleged onset date in 2009, as well as likely longstanding cognitive deficits that predated her suicide attempt.  (Tr. 492, 497).  In other words, despite her longstanding cognitive difficulties and the additional memory and cognition impairments related to her suicide attempt, DeRosia's mental limitations did not prohibit her from maintaining competitive employment before her work-related injury in 2009.  Rather, the record demonstrates that she was mentally capable of maintaining competitive employment prior to her injury and resulting physical impairments.  (Tr. 287).  In sum, I conclude that the ALJ's RFC assessment was based upon a thorough review of the record and was supported by substantial evidence; accordingly, remand is not warranted.  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians who examined [claimant] indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations[;] [a]lthough there was some

conflicting medical evidence, the ALJ's determination that [p]etitioner could perform her previous unskilled work was well supported").

C.  **Credibility Assessment**

I turn next to DeRosia's contention that the ALJ's credibility analysis is flawed because it is unsupported by a complete discussion of the record.  (Docket # 8-1 at 32-34).

An ALJ's credibility assessment should reflect a two-step analysis.  *Robins v. Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011).  First, the ALJ must determine whether the evidence reflects that the claimant has a medically determinable impairment or impairments that could produce the relevant symptom.  *Id.* (citing 20 C.F.R. § 404.1529).  Next, the ALJ must evaluate "the intensity, persistence and limiting effects of the symptom, which requires a credibility assessment based on the entire case record."  *Id.* (citing 20 C.F.R. § 404.1529(c)).  The relevant factors for the ALJ to weigh include:

> (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate her pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of her pain or other symptoms; (6) any measures the claimant uses or has used to relieve her pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii)).

The ALJ concluded that he was "not persuaded that the intensity, persistence and limiting effects of [DeRosia's] symptoms resulted in disabling limitations."  (Tr. 30).  In doing so, the ALJ assessed DeRosia's subjective complaints in the context of a comprehensive review of the entire record.  I disagree with DeRosia's contention that the ALJ relied only on part of the record in making his credibility assessment.

DeRosia maintains that the ALJ failed to consider her subjective complaints of pain, the treatment she received for her right knee, including medication, injections, knee brace, cane, surgery and physical therapy, and the consistent opinions from her treatment providers that she suffered from ongoing knee pain.[12]  (Docket # 8-1 at 32-34).  To the contrary, the ALJ's decision reveals that he considered all of this information in assessing DeRosia's credibility.

The ALJ recounted DeRosia's treatment history, including her treatment with pain medication, injections, physical therapy, and surgery.  (Tr. 30).  He also noted that DeRosia relied upon a cane for ambulation.  (*Id.*).  Further, the ALJ recognized that DeRosia received treatment from several providers, all of whom opined that she was unable to return to work.  (Tr. 30-31).  Despite this evidence, after reviewing the record in its entirety, including the opinions of DellaPorta and Brown, DeRosia's reported daily activities, objective medical findings contained in the treatment records, and documented improvement following her knee surgery, the ALJ concluded that DeRosia's subjective complaints were not credible to the extent she claimed that her physical impairments precluded her ability to engage in sedentary work with some modifications.  (Tr. 30-32).  I conclude that the ALJ applied the proper legal standards in assessing DeRosia's subjective complaints and that substantial evidence supports the ALJ's determination that DeRosia's complaints were not "wholly support[ed]" to the extent they were inconsistent with the ALJ's RFC determination (*see* Tr. 30).  *See Luther v. Colvin*, 2013 WL 3816540, *7 (W.D.N.Y. 2013) (ALJ properly assessed subjective complaints where she "reviewed all of [p]laintiff's subjective complaints . . . [and] properly considered [p]laintiff's activities of daily living, inconsistent testimony and how her symptoms affected her attempts at maintaining a job").

---

[12]  DeRosia also maintains that the ALJ failed to consider the fact that she eventually required the use of a walker and treated with Ameduri to manage her pain.  (Docket # 8-1 at 32).  These events, however, post-date her date last insured.

## CONCLUSION

After careful review of the entire record, this Court finds that the Commissioner's denial of DIB was based upon substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 14)** is **GRANTED**. DeRosia's motion for judgment on the pleadings **(Docket # 8)** is **DENIED**, and DeRosia's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**


_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge


Dated: Rochester, New York
September 14, 2017